IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MALCOLM PHILLIPS,**

    **Petitioner,**

    v.

**WARDEN, NOBLE**
**CORRECTIONAL INSTITUTION,**

    **Respondent.**

Case No. 2:16-cv-00763
**Chief Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

Petitioner, a state prisoner, brings the instant Petition For A Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Joint Motion to Stay (Doc. 7); Petitioner's Motion To Amend (Doc. 9); Petitioner's Motion To Stay (Doc. 10); Respondent's Response In Opposition (Doc. 11); Petitioner's Reply (Doc. 14) and the exhibits of the parties. For the reasons that follow, the Joint Motion To Stay (Doc. 7) is **DENIED AS MOOT**[1] and Petitioner's Motion To Stay (Doc. 10) is **DENIED**.

## I.     FACTS AND PROCEDURAL HISTORY

### A.     State Court Proceedings

Petitioner challenges his December 2013 convictions after a jury trial in the Franklin County Court of Common Pleas on one count of possession of cocaine with an accompanying firearm specification, and having a weapon while under disability. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> By indictment filed July 20, 2012, plaintiff-appellee, the State of Ohio, charged appellant with one count of possession of cocaine, in violation of R.C. 2925.11, a first-degree felony with an accompanying firearm specification, and one count of

---

[1] Respondent has withdrawn the Joint Motion To Stay. *See* Response in Opposition (Doc. 11, PAGEID #: 39, n.1.)

having a weapon while under disability, in violation of R.C. 2923.13, a felony of the third degree.

At trial, the state presented evidence that a trash pull conducted on January 27, 2012 at appellant's residence produced a trace amount of cocaine and packaging materials consistent with cocaine trafficking. A subsequent search warrant issued on January 31, 2012, based in part on the result of the trash pull, yielded approximately $5,000 in cash and a digital scale with a trace amount of cocaine on it. The next day, February 1, 2012, appellant rented a storage unit at 5275 Gender Road.

Two days later, on February 3, 2012, appellant was a passenger in his own vehicle being driven by Bruce Wiggins. During a traffic stop and search of the vehicle, police arrested appellant for possession of marijuana and cocaine. Police conducted a search incident to arrest of appellant's person and found an access card for the storage unit. Later that day, police located the storage unit, and a police canine alerted to the presence of a narcotics odor inside the unit. While police waited for a search warrant to issue, two plain-clothes police officers guarding the unit saw appellant driving his vehicle toward the unit. Two other men, Wiggins and Deandre Green, were in the vehicle with appellant. The three men attempted to flee the scene, but police eventually apprehended appellant.

Once the search warrant for the storage unit issued, police officers opened the unit and found that it was largely empty. The only items in the storage unit were an empty box and a black duffel bag. The duffel bag contained 138 grams of cocaine, two firearms, and cash.

Following the trial, the jury returned guilty verdicts as to all counts. After a sentencing hearing, the trial court sentenced appellant in a January 13, 2014 judgment entry to a term of imprisonment totaling 13 years. Appellant timely appealed his conviction to this court, and that appeal is still pending. *State v. Phillips*, 10th Dist. No. 14AP–79.[2]

On January 13, 2014, appellant filed a motion for a new trial based on newly discovered evidence pursuant to Crim. R. 33(A)(6). Appellant included with his motion an affidavit from Green. The trial court conducted a hearing on appellant's motion on February 21 and March 28, 2014. Green, appellant's only witness at the hearing, testified that he approached appellant's counsel after appellant's sentencing to inform him that the drugs found in appellant's storage unit actually belonged to Wiggins.

According to Green's testimony, Wiggins called Green a week before appellant's arrest to tell Green that he "had came [sic] up on some stuff like and he was going

---

[2] On November 20, 2014, the appellate court affirmed the judgment of the trial court. *State v. Phillips*, No. 14AP-79, 2014 WL 6482778 (Ohio Ct. App. Nov. 20, 2014). On May 20, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Phillips*, 142 Ohio St.3d 1466 (2015).

to make a lot of money off of it." (Feb. 21, 2014 Tr. Vol. I, 15–16.) Green understood the "stuff" to mean drugs that Wiggins had stolen from someone else. Green further testified that, on February 3, 2012, Wiggins called Green after appellant's arrest for drug possession. According to Green's testimony, in this conversation, Wiggins informed Green that appellant was going to jail, and Wiggins said he needed to "find something to do with this other stuff that I got." (Feb. 21, 2014 Tr. Vol. I, 20.) Green then testified that, when he accompanied Wiggins and appellant to the storage unit, it was Wiggins who yelled for appellant to "pull off" and to "get out of here" after spotting the plain-clothes police officers. (Feb. 21, 2014 Tr. Vol. I, 18.) When asked why he did not come forward with this information before or during appellant's trial, Green testified he "was scared, and * * * didn't want to get in no trouble also." (Sic.) (Feb. 21, 2014 Tr. Vol. I, 22.) Green also testified he did not realize appellant would face such a severe sentence for these crimes.

In a decision and entry dated April 2, 2014, the trial court denied appellant's motion for a new trial. Appellant timely appeals.

*State v. Phillips*, No. 11AP-362, 2014 WL 5768688, at *1–2 (Ohio Ct. App. Nov. 6, 2014). On November 6, 2014, the appellate court affirmed the trial court's judgment. *Id*. On May 20, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Phillips*, 142 Ohio St.3d 1466 (2015).

On March 14, 2016, Petitioner filed in the state trial court a Motion For Declaration That Defendant Was Unavoidably Prevented From Discovering New Evidence Within 120-Day Time Limit And For Leave To File A New Trial Motion. (Doc. 11-1, PAGEID #: 48). In the Motion, Petitioner stated that the prosecutor notified him on February 24, 2016 that Detective Tye Downard, formerly with the Reynoldsburg Police Department, had been charged with possession with intent to distribute a controlled substance and subsequently committed suicide while in jail. (*Id*. at PAGEID #: 49). Petitioner argued that Detective Downard worked as a lead investigator in his case, and this newly-discovered evidence called into question the validity of the criminal charges against him. (*Id*. at PAGEID #: 50, 53).

Petitioner argued further that the trial court should grant him a hearing on the Motion For A New Trial to address this information and related issues. (*Id*. at PAGEID #: 54). Specifically, Petitioner asserted:

> It is long established that that the State has an independent obligation to disclose exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963). Further, a conviction obtained through the use of false or tainted evidence, known to be such by the State, must fail under the 14th Amendment. *Napue v. Illinois*, 360 U.S. 264 (1959). The only way to flesh out these issues is to grant a hearing on a motion for a new trial.

(*Id*.).

On April 28, 2016, Petitioner filed a Supplement to his Motion For Leave To File New Trial, indicating that he learned on April 27, 2016 that Detective Shane Mauger, another former Reynoldsburg police officer involved in his case, agreed to plead guilty to federal charges involving conspiracy to deprive persons of civil rights and federal program theft relating to his misconduct as a Reynoldsburg police officer. (*Id*. at PAGEID #: 83–84). Detective Mauger subsequently pleaded guilty to the charges against him, which involved his admission to conspiring with Detective Downard between November 2006 and February 2016 to steal money and property during and in the execution of police warrants. (*See* Doc. 2-1 in *United States v. Mauger*, Case No. 2:16-cr-91, PAGEID #: 10–11). Detective Mauger also admitted to participating knowingly in the execution of search warrants containing false information as a part of the conspiracy. (*See id.*).

Petitioner argued that the filing of criminal charges against these two police officers warranted a new trial. (Doc. 11-1 at PAGEID #: 85). On December 14, 2016, however, the trial court denied Petitioner's Motion For A Declaration That He Was Unavoidably Prevented From Discovering New Evidence Within The 120-Day Time Limit And For Leave To File A New Trial Motion, finding that the detectives' involvement in his case was minimal. (*Id.* at PAGEID

4

#: 141–42). Petitioner states that he filed a timely Notice of Appeal on January 11, 2017, in which he raises a claim under *Brady*. (Doc. 14 at PAGEID #: 146). Petitioner's appeal has not been made a part of this Court's record.

### B. The Instant Petition And Related Motions

On August 4, 2016, Petitioner filed the instant Petition For A Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254. Petitioner asserts that he was denied the right to the effective assistance of counsel when his attorney failed to challenge the legality of the traffic stop and qualifications of the canine or canine handler (claim one); that he was denied a fair trial based on prosecutorial misconduct because the prosecutor improperly commented on his right to remain silent (claim two); and that the evidence is constitutionally insufficient to sustain his conviction(s) (claim three). (*See* Doc. 1). On August 15, 2016, the Court ordered Respondent to make a return to the Petition within 20 days (Doc. 2), a deadline which the Court extended (*See* Docs. 4, 6).

From there, this habeas case took an atypical procedural turn. On November 10, 2016, the parties filed a Joint Motion To Stay the proceedings. (Doc. 7). Specifically, the parties jointly sought to stay the proceedings pending Petitioner's appeal of the denial of his Motion For Leave To File A Motion For A New Trial. (*Id.*). Upon review of the Joint Motion, the Court promptly scheduled a status conference.

During that conference, the Court explained to counsel that they may not simply agree to a stay; rather, the relevant analysis is governed by the United States Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269 (2005). As discussed during the conference, *Rhines* pertains to the analogous situation where a petition is mixed, in that it contains exhausted and unexhausted

5

claims. Hence, at the Court's request, the parties agreed to submit supplemental briefing on the Motion. (*See* Doc. 8).

Thereafter, the parties changed their positions. Trying to make this case fit more squarely within the *Rhines* decision, Petitioner filed a Motion to Amend his Petition to add the following ground for relief:

> **GROUND FOUR**: A defendant is deprived of due process and his right to a fair trial, when the State fails to disclose materially exculpatory evidence. Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
>
> **Supporting Facts**: Malcolm Phillips was convicted based on the testimony of two detectives who were subsequently indicted for crimes they committed while in the line of duty during the time they were investigating and arresting Mr. Phillips. This information was not disclosed to Mr. Phillips.

(Doc. 9 at 2). Petitioner also filed a Motion to Stay proceedings concurrent with the Motion to Amend. (Doc. 10). In the Motion to Stay, Petitioner relied on *Rhines* to argue that proceedings related to the mixed Petition should be stayed. (*Id*. at 2–3).

For its part, Respondent filed an Opposition to both the Motion to Amend and the Motion to Stay the proceedings. (Doc. 11). As an initial matter, Respondent argues that Petitioner has failed to show that his claim is potentially meritorious, which is required to warrant a stay under *Rhines*. (*Id*. at 9). Respondent further argues that

> [s]ince Phillips does not qualify for a stay, an amendment will create a mixed petition, necessitating deletion of the *Brady* claim for the court to move ahead to resolve the remaining claims. Alternatively, if the *Brady* claim is included in the federal petition, the petition could be dismissed in its entirety as unexhausted.

(*Id*.). Respondent also argues that Petitioner's claim was not fairly presented to the trial court, so it "could ultimately be considered procedurally defaulted and therefore waived in the federal habeas proceeding." (*Id*. at n.2).

6

## II.  DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner must first exhaust his claims in the state courts before presenting them in federal court. 28 U.S.C. § 2254(b); *see Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000). Additionally, a district court has discretion to stay a mixed petition containing exhausted and unexhausted claims in certain limited circumstances. *Rhines*, 544 U.S. at 269.

Given the procedural posture of this case, this Court is not faced with a "typical scenario of a 'mixed petition' that includes both exhausted and unexhausted claims." *Santana v. Ryan*, No. 14-cv-14097, 2015 U.S. LEXIS 99672, at *9 (D. Mass. July 30, 2015). That is, as discussed below, because the claims in the Petition are exhausted and the proposed claim is unexhausted, this case does not fit the more typical scenario addressed in *Rhines*. Nevertheless, courts faced with similar circumstances have found *Rhines* applicable. *See, e.g.*, *Santana*, No. 14-cv-14097, 2015 U.S. Dist. LEXIS 99672, at *9 (finding the "stay-and-abeyance analysis is the same" despite the fact that the unexhausted claim was not in the petition); *Womack v. Saba*, No. 11-40138-FDS, 2012 U.S. Dist. LEXIS 26713, at *6 (D. Mass. Mar. 1, 2012) (same). Consistent with those decisions, *Rhines* guides this Court's analysis. Thus, the Court first examines the exhaustion and timeliness of Petitioner's claims and next considers if the limited circumstances that warrant a stay are present here.

### A. Exhaustion And Timeliness

As stated previously, a state prisoner must exhaust his available remedies in the state courts before a federal habeas court may grant relief. *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, the claim is not exhausted. 28 U.S.C. § 2254(b), (c). Additionally, a constitutional

claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A habeas petitioner bears the burden of demonstrating that exhaustion of the available state court remedies with respect to the claims presented for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987).

AEDPA also provides a limitations period and tolling provision intended to "promote[ ] the exhaustion of state remedies while respecting the interest in the finality of state court judgments." *Carey v. Saffold*, 536 U.S. 214, 220 (2002) (*quoting Duncan v. Walker*, 533 U.S. 167, 178 (2001)). Relevant to the claims in the Petition, AEDPA provides that:

> (d) (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

28 U.S.C. § 2244(d)(1)(A); *see also Pierce v. Warden*, No. 3:10cv00132, 2012 WL 5511220, at *8 (S.D. Ohio Nov. 14, 2012) (noting that if a petitioner's habeas petition "raises claims connected to his trial and convictions, he knew or should have known about such claims during the pendency of his initial attempt to directly appeal his convictions in state court").

Pursuant to § 2244(d)(1)(A), the judgment of conviction became final on the three claims in the Petition on August 18, 2015, ninety days after the Ohio Supreme Court's May 20, 2015 dismissal of the appeal; *i.e.*, when the time expired to file a petition for a writ of *certiorari* with the United States Supreme Court. *See Weese v. Sloane*, No. 1:15-cv-122, 2016 WL 614001, at *2–3 (N.D. Ohio Feb. 16, 2016) ("[F]or petitioners who seek review on direct appeal in the Supreme Court of Ohio, 'the one-year statute of limitations does not begin to run until the time for filing a petition for a writ of *certiorari* for direct review in the United States Supreme Court

has expired.'") (citations omitted). Consequently, the statute of limitations began to run the following day and ran for a period of 209 days, until March 14, 2016. On that day, Petitioner filed his Motion For Leave To File A Motion For A New Trial, which, as explained below, tolled the running of the statute of limitations under 28 U.S.C. § 2244(d)(2).

Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." However, in order to toll the running of the statute of limitations under that statute, a state post-conviction or collateral action must have been "properly filed." *See, e.g.*, *Hall v. Warden, Lebanon Corr. Inst.*, No. 1:08CV75, 2009 WL 857979, at *7 (S.D. Ohio Mar. 25, 2009) ("During the one-year limitations period, petitioner was entitled to statutory tolling under § 2244(d)(2) based on any pending 'properly filed' applications for state post-conviction relief or other collateral review.").

A state post-conviction or collateral action is "properly filed" if "its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (noting that "[t]hese usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee"). Thus, a post-conviction or collateral action dismissed by the state courts as untimely is not "properly filed" under § 2244(d)(2) and would not toll the running of the statute of limitations. *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005); *see also Gorman v. Brunsman*, No. 1:03CV865-SJD, 2006 WL 1645066, at *7 (S.D. Ohio June 7, 2006).

Here, the trial court determined that Petitioner's Motion For Leave To File A Motion For A New Trial was properly filed under Ohio Criminal Rule 33 to the extent that "he clearly could *not* have discovered and produced the evidence submitted in his Motion during his trial." (Doc.

9

11-1, PAGEID #: 140 (emphasis in original)). However, the trial court denied Petitioner's Motion based upon its finding that the newly-discovered information did not materially affect Petitioner's substantial rights. (*Id.*, PAGEID #: 140–42) ("[T]his Court is not at all convinced that the impeachment value relevant to those two Reynoldburg officers is sufficient to undercut the validity of a trial in which their peripheral participation was of so little consequence."). Petitioner's appeal of the trial court's decision denying his Motion remains pending. *See Ohio v. Phillips*, No. 17AP-21 (Ohio Ct. App. 10th Dist.). Based upon the foregoing, Petitioner's properly filed Motion For Leave To File A Motion For A New Trial tolled the running of the statute of limitations under 28 U.S.C. § 2244(d)(2). Thus, the statute of limitations has not yet expired, and will not bar Petitioner from re-filing this action upon the exhaustion of the proposed claim.

### B. Stay Of These Proceedings

Under *Rhines v. Weber*, 544 U.S. at 269, a court may permit a stay only in certain circumstances. *See id*. For instance, the court must determine that good cause exists for the petitioner's failure to exhaust the claims in the state courts. *Id.* at 277. Further, even if good cause exists, the court may not grant a stay if the unexhausted claims are plainly meritless. *Id.* "On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id*. at 278.

In this case, Petitioner seeks a stay of these proceedings pending exhaustion of his *Brady* claim based on the prosecutor's alleged failure to disclose the criminal activity of Detectives Mauger and Downard. Petitioner can establish "good cause" for failing to exhaust his state

remedies as to the proposed amended claim and there is no indication that he engaged in intentionally dilatory litigation tactics. (*See* Doc. 11-1, PAGEID #: 140 (opinion of the trial court noting that Petitioner could not have discovered the evidence during trial). However, the record fails to reflect that Petitioner's unexhausted claim is potentially meritorious so as to warrant a stay under *Rhines*.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 86. Evidence is material "[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "There is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir. 1996). "In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required." *United States v. Jones*, 766 F.2d 994, 998 n. 1 (6th Cir. 1985) (citing *United States v. Campagnuolo*, 592 F.2d 852, 861 & n. 9 (5th Cir.1979)). "*Brady* generally does not apply to the delayed disclosure of exculpatory information, only to a complete failure by the prosecutor to disclose such information. *Carter v. Harry*, No. 07–12211–BC, 2010 WL 2772349, at *5 (E.D. Mich. July 13, 2010) (citing *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002)).

Here, the trial court found that Petitioner had failed to establish that any of the newly discovered evidence was material in that it affected his substantial rights. (Doc. 11-1 at PAGEID #: 140–41). The trial court stated:

> The question . . . is whether the evidence discovered is actually material to the Defendant's case.
>
> The short answer, at this point in time, is clearly "no." This Court has examined the transcript of the trial, and has further noted the facts as set forth in the Court of Appeals' decision, which is fifty-two (52) pages in length. It is evident that the case against the Defendant is overwhelmingly a case that was handled by the Whitehall Police Department, and not the Reynoldsburg police. Although Downard and Mauger have a small role in the case, mainly at the very beginning, the evidence against the Defendant was based on a warrant obtained by Whitehall P.D. to search a storage garage. Whitehall police officers located a storage facility, and a Franklin County Sheriff's K-9 unit alerted Whitehall officers to the specific unit in that facility.
>
> In addition, the Defendant's case was a total denial that the weapons and drugs found in that storage unit belonged to him. Clearly, the Defendant did drive to the storage facility and was apprehended while trying to leave (once he and the occupants of the car realized that the police were there).
>
> As such, therefore, this Court is not at all convinced that the impeachment value relevant to those two Reynoldsburg officers is sufficient to undercut the validity of a trial in which their peripheral participation was of so little consequence.
>
> … There is incontrovertible evidence that the Reynoldsburg Police Department had two very bad apples working there, with one now deceased by his own hand, and the other doing prison time in a federal penitentiary. But to include the Whitehall Police Department, or any of its officers and/or detectives, in that wrongdoing is, at this moment, pure speculation which does not even begin to rise to the level of permitting a Motion for a New Trial to be filed.

(*Id*. at PAGEID #: 141–42). These factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

Further, the trial court's findings are supported by the lengthy factual recitation provided by the state appellate court on direct appeal, which also shows that Detectives Downard and Mauger played a minimal role in Petitioner's case. *See Phillips*, 2014 WL 6482778, at *18. The state appellate court summarized evidence in Petitioner's case as follows:

> On January 25, 2012, Mauger received an anonymous call regarding suspected narcotics trafficking at a residence located at 5903 Little Brook Way. The caller reported the license numbers for two vehicles parked at the residence. Based on this call, Mauger conducted surveillance of the residence the next day, and he verified the accuracy of the license numbers provided by the caller. Pursuant to a subsequent vehicle registration check, Mauger identified appellant and McWhorter as the owners. On January 27, 2012, Mauger performed a trash pull of trash deposited at the end of appellant's driveway. The trash pull resulted in the recovery of several baggies wrapped with electrical tape. One of the baggies contained a white residue. Mauger field tested the substance and concluded that it was cocaine.
>
> Based on these facts, Mauger obtained a search warrant for 5903 Little Brook Way and the vehicles registered to appellant and McWhorter. With the aid of Downard and the CPD, Mauger executed the search warrant on January 31, 2012. Both appellant and McWhorter were present at the time of the search. The search resulted in the discovery of $5,020 in cash, a 9 mm weapon, a plastic baggie containing cocaine residue, and a digital scale containing cocaine residue. FN9
>
> FN9: The parties stipulated, pursuant to a laboratory report generated by an Ohio Bureau of Criminal Identification and Investigation ("BCI & I") forensic scientist, that the residue in both the plastic baggie and on the digital scale was cocaine. (State's exhibit F.)
>
> Three days later, on February 3, 2012, Adams conducted a traffic stop of appellant's vehicle based on a license plate illumination violation. Appellant was seated in the front passenger seat; Wiggins was the driver. During the traffic stop, Adams summoned a canine unit to the scene. After appellant and Wiggins were removed from the vehicle, the canine alerted to the scent of narcotics inside the vehicle. A subsequent search of the vehicle revealed marijuana "shake" on the passenger's side floor and cocaine in a bag in the middle of the backseat. FN10 (Dec. 11, 2013 Tr. 444.) Adams placed appellant under arrest and, pursuant to a pat-down search, discovered a business card for a public storage facility. The card included the name and address of the storage facility, an eight-digit access code to the facility, and the number of a particular storage unit within that facility. Adams subsequently made a copy of the storage facility card, returned the original to appellant, and thereafter released him.

FN10: The parties stipulated, pursuant to a laboratory report generated by a BCI & I forensic scientist, that the substance inside the bag was cocaine. (State's exhibit G.)

Later that day, Grinstead was informed of the traffic stop and subsequent discovery of the storage facility card on appellant's person. Grinstead contacted the storage facility and was informed by facility management that, on February 1, 2012, appellant rented a storage unit at a facility located on Gender Road. Grinstead and Wilder traveled to the Gender Road location and spoke to facility management, who verified that appellant leased unit # 1614. FN11 Grinstead and Wilder then drove to unit # 1614 and summoned a canine unit to the scene. After the narcotics dog alerted to narcotics in unit # 1614, Grinstead prepared a search warrant affidavit for unit # 1614. He left Wilder to safeguard the storage unit while he obtained a search warrant from a judge.

FN11: The parties stipulated that records kept by the Gender Road storage facility in the ordinary course of business established that appellant entered into a rental agreement for unit # 1614 on February 1, 2012. (State's exhibit D.)

Thereafter, Wilder requested Downard's aid in safeguarding the storage unit. FN12 Downard thereafter met Wilder at the storage unit. Both Downard and Wilder were dressed in plain clothes and drove unmarked police vehicles. Wilder noticed a vehicle driving slowly in the vicinity of unit # 1614. FN13 Wilder noted the license number and identified the vehicle as the one involved in the traffic stop earlier that day. In addition to appellant, the vehicle contained two other male occupants—Wiggins in the front passenger seat and Green in the back seat. Wilder eventually positioned his vehicle "[d]river's side window to driver's side window" with appellant's vehicle, displayed his police badge, and yelled "[p]olice. Get your hands up where I can see them." (Dec. 11, 2013 Tr. 483.) At trial, Downard corroborated this testimony.

FN12: Wilder testified that he enlisted Downard for safety reasons, as drug traffickers frequently store narcotics, large amounts of cash, and firearms in public storage units.

FN13: Because he was aware of the ongoing investigation surrounding appellant, and due to concerns that appellant might drop off or retrieve narcotics from the storage unit, Wilder familiarized himself with appellant's photograph and license number of his vehicle.

According to Wilder, Green "frantically immediately reached down to the left of his seat * * * as if he was maybe trying to place something there or pick something up that he had dropped." (Dec. 11, 2013 Tr. 485.) Because appellant did not immediately heed Wilder's command, Wilder believed appellant was going to drive away. Wilder again displayed his police badge, identified himself as a police officer, produced his service weapon, and again ordered appellant and

the other occupants to "[g]et your hands up where I can see them." (Dec. 11, 2013 Tr. 484.) Appellant immediately drove off at a high rate of speed. Wilder pursued the vehicle and eventually located it at the front gate. Wilder ordered appellant to stop the vehicle. Appellant complied and Wilder approached the vehicle. As he did so, Wilder noticed a "very strong odor of burning marijuana coming from the vehicle." (Dec. 11, 2013 Tr. 488.) Wilder ordered appellant and the passengers to exit the vehicle. As Green exited, Wilder observed marijuana vegetation fall from his lap and a cigar filled with marijuana fall to the floor. Pursuant to a search of the vehicle, Wilder recovered a digital scale containing white residue in the console area between the front seats. The white residue was field tested and determined to be cocaine.

Wilder removed the keys from the ignition and found two keys to the storage unit on the key chain. FN14 About the same time, Grinstead returned with a search warrant for the storage unit. Wilder thereafter used the keys found on appellant's key chain to open two locks on the storage unit. Inside the storage unit was a black duffel bag containing two operable firearms, a bag of loose ammunition, $54,800 in cash, and 138 grams of powder cocaine. FN15

FN14: Each storage united contains two separate locks accessed by two separate keys.

FN15: The parties stipulated, pursuant to laboratory reports generated by BCI & I forensic scientists, that both firearms were operable and that the narcotics recovered constituted 138 grams of cocaine. (State's exhibit H.)

Appellant, Green, and Wiggins were all searched. Police recovered a storage facility card from appellant which included the number of the storage unit, # 1614, as well as an access code to the facility. Appellant was arrested; Wiggins and Green were released.

*Id.* at \*18–20.

Based upon the record, it does not appear that Petitioner can establish that evidence regarding the criminal charges against Detectives Downard and Mauger constitutes material evidence within the meaning of *Brady* such that his proposed amended claim is potentially meritorious and warrants a stay of proceedings pending exhaustion. *See Rhines*, 125 S. Ct. at 270. Thus, the Court in its discretion finds a stay inappropriate in this case.

15

### C. Petitioner's Options

Based upon this Court's finding that a stay is inappropriate, Petitioner must decide how he wishes to proceed. If Petitioner opts to pursue his current strategy, he may request a ruling on a Motion to Amend, which Respondent opposes as futile. If the Court grants that Motion, the Petition would be mixed and may be subject to dismissal under the total exhaustion requirement established in *Rose v. Lundy*, 455 U.S, 509,518–19 (1982) and preserved by AEDPA, given this Court's determination that the stay-and-abeyance procedure is inapplicable.

On the other hand, Petitioner may opt to withdraw his Motion to Amend, deleting the unexhausted claim and simply proceed on the exhausted claims in the Petition. If Petitioner does so, however, he may be barred from bringing his proposed *Brady* claim at a later time due to AEDPA's limitation on second or successive petitions. *See* 28 U.S.C. § 2244(b).

Finally, Petitioner may choose to withdraw his habeas petition and seek dismissal of this case without prejudice so that he may file later a fully exhausted petition containing his *Brady* claim, assuming he could file any such petition prior to the expiration of the applicable statute of limitations.

Accordingly, Petitioner is **ORDERED** to advise the Court within ten (10) days how he intends to proceed.

### III.   CONCLUSION

For the foregoing reasons, the Joint Motion To Stay (Doc. 7) is **DENIED AS MOOT** and the Motion To Stay (Doc. 10) is **DENIED**. Petitioner is **ORDERED** to advise the Court within ten (10) days how he wishes to proceed.

**Procedure on Objections to Order**

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This Order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

IT IS SO ORDERED.


Date:  April 21, 2017                              /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE